STANKO ILIC, Plaintiff-Appellee, *v.* HENRY CROWN & COMPANY, Defendant and Counterplaintiff-Appellant.—(MONTICELLO REALTY CORP., Counterdefendant-Appellee.)

First District (4th Division)    No. 80-1299

Opinion filed June 4, 1981.

John E. Guy, of Abramson & Fox, of Chicago, for appellant.

John A. Doyle, Ltd., of Chicago, for appellee Stanko Ilic.

Francis J. Marasa, of Chicago (Sweeney & Riman, Ltd., of counsel), for appellee Monticello Realty Corp.

Mr. PRESIDING JUSTICE ROMITI delivered the opinion of the court:

Plaintiff, Stanko Ilic, brought an action pursuant to the Structural Work Act (Ill. Rev. Stat. 1975, ch. 48, par. 60 *et seq.*), for injuries suffered when he fell from a catwalk while working on the alteration of a building located at 300 West Washington Street in Chicago. Defendant, Henry Crown & Company (Crown), filed a third-party complaint seeking indemnity from counterdefendant Monticello Realty Corporation (Monticello). The jury returned a verdict against Crown on both complaints. Defendant has appealed from the entry of judgment on those verdicts, contending that Monticello and not Crown was shown by the evidence to have been in charge of the work on the building.

We affirm.

At trial Charles Heasley testified that at the time plaintiff was injured Heasley was employed by defendant as building manager of the building at 300 West Washington, which defendant owned. Prior to April of 1973 the second floor and part of the third floor of the building had been leased by the Chicago Mercantile Exchange. For their operations the Exchange had a catwalk or work platform from which employees could post information on boards located on the walls. When the Exchange vacated the premises Heasley, on behalf of the defendant, participated in the negotiation of a lease with a new tenant. As part of the lease agreement extensive renovation and remodeling was to be done, including demolition of the catwalk.

According to Heasley, defendant had placed him in charge of the renovation and remodeling. He performed, on behalf of defendant, the function of a general contractor. As such he had the right to hire and fire subcontractors, to inspect their work, and to cause changes in the work if he was dissatisfied with it. If during one of his inspections he observed a subcontractor performing work in an unsafe manner he, as the person in charge, had the right to bring this to the attention of the man's supervisor. From time to time defendant's owners, including people like Henry Crown, conferred with Heasley concerning the work in progress.

Heasley brought in outside subcontractors to do some of the work. He also used employees of companies related to defendant. Thus in connection with the demolition of the catwalk he used janitors employed

by Monticello. One Monticello superintendent of the work was Charles Sanders. Sanders' assistant foreman was Mike Rybak. One of the Monticello janitors used in the work was the plaintiff.

Heasley described the catwalk being taken down as a platform with plywood flooring and a railing along the left side but not along the right side. Underneath the catwalk was a ceiling. Some flooring had covered part of the ceiling but this was removed by Rybak's crew under Heasley's general direction. Heasley did not see the plaintiff fall; he was called after plaintiff had been taken to the hospital.

Heasley also testified that one of his main duties was to serve as vice-president of Monticello, the managing agent for the building. Robert Crown had appointed him to this position. As managing agent Monticello was responsible for the complete operation and leasing of the building. In Heasley's dealing with outside contractors other than Monticello the name of Monticello was used. Monticello paid those contractors and the building permit was obtained in its name. The janitors were also paid by Monticello. Heasley's salary was billed to Monticello.

Heasley testified that as vice-president of Monticello he performed managerial duties at the building, including seeing that the space was prepared for new tenants. Heasley left the employment of defendant and Monticello at the same time; when he did so he informed the president of Monticello and Henry Crown.

Mike Rybak, a janitor employed by Monticello, testified that during the renovation he was an assistant foreman. His immediate supervisor was Charles Sanders. Heasley was the building manager during the renovation. If Sanders was not there then Heasley would talk directly to Rybak concerning the renovation. On the day of the accident plaintiff was working in Rybak's crew. From his position on a rolling scaffold Rybak saw plaintiff fall from the catwalk to the floor, a distance of 18 feet.

Thomas Brouder testified that he had been employed by defendant from 1965 to 1976. His responsibilities included serving as a vice-president of Monticello. According to Brouder, defendant owned the building being renovated and Heasley acted on behalf of defendant as a general contractor, coordinating the work. Both defendant and Monticello had responsibility for the renovation and remodeling, but defendant had the ultimate responsibility. Although Brouder testified that a parent and subsidiary relationship existed between defendant and Monticello, he also testified they were separate and distinct entities.

Plaintiff, 70 years old at the time of trial, testified that he was employed as a janitor by Monticello from 1968 to 1973. His health had been excellent. On April 20, 1973, while working on the catwalk, he fell 18 to 19 feet, landing on his back and incurring severe injuries which had left him unable to work from then on.

Two doctors called by the plaintiff testified concerning the severity and continuous nature of plaintiff's injuries.

Plaintiff's final witness was William C. Heilman, a professional safety consultant. Heilman testified that he was familiar with standards, codes, and industry practices concerning the safe operation and use of catwalks as work platforms in Chicago. It was his opinion that the catwalk from which plaintiff fell did not provide a safe and proper scaffold. This was because no handrail or guardrail was provided, there was no life belt or similar protection system, and part of the catwalk had been dismantled, leaving only 3/4-inch acoustical tile with very little strength. He also testified that it was the responsibility of a general contractor to see that the work progressed in a reasonably safe manner.

The sole defense witness was Robert Siepka, risk manager for defendant. He testified that defendant and Monticello were separate and distinct corporations and that Monticello had acted as defendant's agent in leasing space in the building and renovating it.

The jury found for the plaintiff and against the defendant, assessing damages in the amount of $275,000. In response to special interrogatories submitted by defendant they found that defendant was one of those in charge of the work and that Monticello's conduct was not the major fault as compared to defendant's conduct in causing plaintiff's injuries. Accordingly, they found that defendant was not entitled to indemnification from Monticello.

The primary issue raised by defendant on appeal is whether it was shown to have been in charge of the work, so as to be liable for plaintiff's injuries under the Structural Work Act.

The determination of whether a party is in charge of the work depends upon evaluation of the totality of the circumstances. (*Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 373 N.E.2d 1348.) However this court has identified a number of specific factors relevant to that determination: supervision and control of the work or retention of the right to do so; consultant participation in ongoing activities at the construction site; supervision and coordination of subcontractors; responsibility for taking safety precautions for employees at the job site; authority to make changes in the work; and the right to stop the work. *Westerfield v. Arjack Co.* (1979), 78 Ill. App. 3d 137, 397 N.E.2d 451, and cases cited therein; *Hausam v. Victor Gruen & Associates* (1980), 86 Ill. App. 3d 1145, 408 N.E.2d 1051.

In this cause, the evidence as to those factors established that defendant was in charge of the work. The testimony of Charles Heasley was that he was placed in charge of the work by defendant, performing as a general contractor on its behalf. He had the right to inspect the work, to hire and fire subcontractors, to cause changes in the work if dissatisfied

with it, and to monitor safety factors. He conferred directly with defendant's owners concerning the work in progress. Thus defendant, through its employee and general contractor, was in charge of the work.

At the time of the accident Heasley was also employed as a vice-president of Monticello. But contrary to defendant's allegations on appeal, defendant's liability was not based on this relationship. Nor was defendant's liability based merely on its status as owner of the building, a status which is insufficient in itself to create such liability. (*Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481, 394 N.E.2d 403.) Defendant's liability was based on its direct control of the work, exercised through its employee Charles Heasley, acting in his capacity as its employee.

The testimony concerning Heasley's relationship with Monticello as it pertained to the work was much more general. One of his main duties was to serve as Monticello's vice-president, and Monticello was the managing agent for the building. But as we have noted, Heasley specifically linked his function as a general contractor to his employment by defendant, not his position with Monticello. Thus there was ample support for the jury's determination that defendant was in charge of the work and bore the major responsibility, in comparison with that of Monticello, for plaintiff's injuries.

The judgment of the trial court is affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.